[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff husband brought this action seeking a dissolution of the marriage of the parties on the ground of irretrievable breakdown, and other relief. The defendant wife admitted in her answer that the marriage had broken down irretrievably; in her cross-complaint, she sought a dissolution of the marriage on the ground of irretrievable breakdown, alimony, a fair and equitable property settlement, and other relief. At the trial, both parties appeared by counsel and testified, and a number of exhibits were introduced into evidence. Their financial affidavits were also filed.
From the evidence, the court finds the following facts. The plaintiff husband, John P. Iannello, married the defendant wife, whose maiden name was Frances Jean Kirby, at Lerici, Italy, on December 12, 1988. The husband has resided continuously in this state for at least one year before the date his complaint was filed. The parties have no minor children, issue of their marriage, and none have been born to the wife since the date of the marriage. Neither party receives public assistance. All statutory stays have expired and the court has jurisdiction.
The husband is now fifty years old; he has bachelor's and master's degrees in electrical engineering and a Ph.D in physical oceanography. He is in good physical health, except for a detached retina, which was surgically CT Page 9107 repaired, but has also suffered from bouts of mental depression which have come and gone sporadically since his teenage years. These have not significantly impaired his ability to work in his chosen profession as a scientist/engineer at the Naval Underwater Systems Center, where he now works. He continues on medication.
The wife is now sixty-four years of age, and is unemployed. She is a college graduate with a bachelor's degree in psychology. She has held a real estate salesman's license in the past, but it has expired. She suffers from recurring bouts of pneumonia, takes medication daily, has arrhythmia, and a possible ovarian cyst, for which she sees a physician from time to time.
The husband was a forty-three year old bachelor when he first met the wife in 1986. She had been married twice before, and has three grown daughters from her first marriage. Both of her marriages ended in divorce. After the parties had been dating and going together for about a year, she moved into his Mystic home. The wife had worked full time in real estate sales in 1986, and earned about $25,500 gross. After she began residing with the plaintiff, however, she devoted much of her time to entertaining their guests at dinner parties, housekeeping, and the like, and did not engage in employment outside of the home except for a short time in 1987. In late 1987, the plaintiff received an offer to live and work in Italy on a North Atlantic Treaty Organization (NATO) project, which he accepted. The defendant went with him, and they set up housekeeping in Italy in the late spring of 1988. The defendant is a gourmet cook, and the plaintiff hoped that she would be able to work on writing a cookbook there, as she would be unable, because of her visa, to obtain other employment. They decided to marry, and did, in Italy, on December 12, 1988.
He essentially claims that the marriage broke down because the wife was continually jealous of him, and unjustifiably accused him of having affairs or improper relationships, including one with their Italian language teacher, causing the termination of their lessons. He also testified that she `drove him crazy' by interrupting his conversations, monopolizing them, and making it impossible for him to continue in dialogues with his friends, colleagues and associates on social occasions. He describes her behavior as CT Page 9108 erratic, and cites as an example a business trip in Turkey with other `important personages', when she made a scene at their hotel over what was described as a crack or hair she observed in the bathroom. He believed that she blew the problem up all out of proportion. He also believed from even before their marriage that she couldn't be trusted, and wasn't always straightforward with him. He cites as examples her age, although he knew of their 14-year age difference before the marriage from looking at her driver's license, and the number of children she had, as she led him to believe she had one, while she actually had three. He testifies that all this led to a failure of communication and the breakdown of their marriage.
The wife has an almost diametrically opposed version of the events leading up to the breakdown. She testified that things went very well in Italy in the beginning, until the husband had an onset of depression. He became withdrawn from her and some of his friends. She believed he was suicidal as a result of a telephone call he made to her while on board ship on a sea trial. He was under stress at work, and although she claims that he was not doing well at work, he was offered an extension of his contract, which he turned down. He denied any suicidal ideation, but in any event, he obtained psychiatric treatment in Italy. Despite this treatment, the parties and their marriage remained on a divergent course.
While in Italy, he transferred to the wife sums totalling $100,000, which approximated one-half of his earnings and other cash benefits received while there. The parties dispute the reason for this transfer, as the wife claims it was because she was concerned about the husband's mental condition and her consequent lack of security in the event `something happened' to him. The husband claims, on the contrary, that at the time, they were already thinking and talking of divorce, and the transfer was an effort to reach a financial settlement and conclude matters amicably. He also paid about $7,000 for cosmetic surgery on her behalf for a face lift.
They came back to the United States in the summer of 1991 and separated. The wife went to Pittsburgh and worked there for about six months, as an apartment rental manager. She returned to Connecticut and moved back in with the husband, and the parties finally separated for good about CT Page 9109 August 1992.
It would serve no useful purpose to attempt a microscopic dissection to determine which party bears the greater fault for the destruction of their marriage. They are both intelligent people, but appeared to be on different tracks even before their marriage. The court finds that the husband's naivete', depression and resultant withdrawal did have an adverse effect on the parties' marriage, but also finds that the wife's inappropriate behavior had a similar adverse effect. Which came first or which resulted in the other, it is impossible to tell. At this point, suffice it to say, their marriage has in fact broken down, and on the state of the evidence, the court cannot find that one party should bear a larger share of the responsibility for the breakdown than the other.
The husband currently earns $1,300 per week gross from his scientist/engineer job and $300 per week gross from teaching, and nets from both jobs, $1,118 per week. He has substantial assets, including his home valued at $95,656, after deduction of a small outstanding mortgage, a sailboat worth $12,000, stocks and bank accounts aggregating about $257,000, and his contributions to his retirement and IRA accounts worth over $105,000. All of these assets were owned by him before the marriage, and during the marriage appreciated in the aggregate about $45,000 to their present values, after balancing out individual declines and increases. The husband also has, incidental to his job, health and medical insurance and other benefits, including his pension/retirement plan, to which his employer also contributes.
The wife is presently unemployed, and although she has looked for employment, the only jobs she has been offered are minimum wage jobs, which she has turned down because of travel expense. Her tax return for the calendar year 1986 shows that she income-averaged her income of $25,000 in 1986 from real estate sales with income of $20,981 in 1984 and $23,043 in 1983.[1] In Pittsburgh, she earned about $500 per week; and, in Annapolis, during another separation, while she worked for several months there for friends, the husband assisted her with monthly payments of $500 to $600. Since, she worked part time selling jewelry for $5.50 to $6 per hour in the summer of 1993, but has not worked full time. The CT Page 9110 court concludes that considering her age, education, experience and the realities of the job market, that at best, she has a present earning capacity of between $160 to $250 per week. When she becomes 65 in September 1994, she will be eligible for $685 per month in social security benefits and medicare health insurance.
She presently has about $45,000 in liquid assets shown on her financial affidavit, which remain from the $100,000 given her by the husband between October 1990 and May 1991. Her expenditures included the purchase of an automobile for $17,000 and $5,000 to one of her daughters. She made some non-monetary contributions to the marriage, such as shopping, laundry, gourmet cooking, entertaining and homemaking, she owned no substantial assets at the time of the parties' marriage, and therefore, made no significant financial contributions to the parties' marriage. Although she had sold her condo, and had about $15,000 on deposit in a bank in early 1987, the court concludes that by the time of the marriage, she had no apparent assets, as she earned only $3,000 in 1987, and her federal income tax return for that year showed no dividend income and only $6 in interest income. At this time, other than the social security and medicare which will go into effect next year, she has no pension/retirement plan or annuity.
It is obvious that the plaintiff husband has far superior earnings than that of the wife, and a superior earning capacity and it appears that he will be financially secure in the future, whereas she may not be.
The court concludes that the handwritten agreement entered into evidence as Plaintiff's Exhibit 1 cannot serve as a settlement agreement in this case for several reasons. First, it was not pleaded as such. More important, it was signed in May 1991, and the financial circumstances of the parties are different now. Finally, they have modified the agreement by their actions in getting back together for a period of time, and by the husband's voluntary payments to the wife in the nature of support, which were accepted by her. In short, neither relied upon the agreement and its terms as an integrated settlement of all of the issues arising out of their marriage and dissolution.
The court has considered all of the factors CT Page 9111 contained in General Statutes 46b-62, 46b-81 and 46b-82, in the light of the foregoing evidence and findings, and enters the following orders.
A decree shall issue dissolving the marriage on the ground of irretrievable breakdown.
The husband shall assign by Qualified Domestic Relations Order (QDRO) the sum of $25,000 from his Merrill Lynch Individual Retirement Account (IRA) to the wife. This transfer shall operate to include all claims of the wife for reimbursement from him of any checks received by him from his medical/health insurance company to date. Any such checks which may be received by him in the future shall belong to the wife, and he shall transmit them to her promptly. The court shall retain jurisdiction for the sole purpose of modification of the judgment so that the QDRO may be conformed to comply with federal or state law respecting retirement/pension benefit plans.
The husband shall pay, as periodic alimony, the sum of $1,300 per month until September 30, 1994; thereafter, it shall be reduced to $400 per month. Said alimony shall not be further modifiable as to term or amount, and shall terminate upon the death of either party, the wife's remarriage or her living with another person within the meaning of General Statutes 46b-86(b). The husband shall also cooperate in obtaining coverage for the wife under his present job-related health and medical insurance policy pursuant to the provisions of the Consolidated Budget Omnibus Reconciliation Act (COBRA) or General Statutes 38a-538, as applicable, and a General Statutes 46b-84(c) order shall enter. The husband shall pay the premium therefore as additional alimony, until the wife is eligible for medicare, or until her death or marriage, whichever first occurs. The alimony and additional alimony payments shall be deductible to the husband and taxable to the wife for federal and state income tax purposes. Until husband's obligation to pay alimony is terminated as above provided, or until his retirement, whichever first occurs, husband shall irrevocably designate wife as beneficiary of $25,000 or the face amount of his job-related life insurance policy,[2] if less; if such is in force as of the date of this decree.
As the parties have agreed, they shall cooperate in CT Page 9112 the filing of joint federal and state income tax returns for the calendar years 1990, 1991 and 1992. The husband shall pay for preparation fees for the same. The parties shall pay for any taxes, interest and liens due thereon, and share any refunds therefrom, if any, for each of said years in proportion to their taxable earnings and after credit for their tax withholdings in each of said years.
The wife shall forthwith return to the husband his gilt framed portrait, circa 1840, identified as two feet by three feet in size. Each shall take, have and own the automobiles and tangible personal property in their respective possession. The husband shall take, have and own the real property owned by him, his boat, and all stock, mutual funds, retirement accounts (except the interest ordered transferred to wife by QDRO) all as described on his financial affidavit free of any claims by the wife.
The wife shall take, have and own all of the bank accounts and mutual funds shown on her financial affidavit free of any claims of the husband.
The husband shall pay toward the wife's counsel fees the sum of $1,000 within sixty days. The court finds that a denial of counsel fees would undermine the other financial orders ordered.
Teller, J.